IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
                                                                  :
*In re*                                                           :    Chapter 11
                                                                  :
GRIDWAY ENERGY HOLDINGS, INC., *et al.*,                          :    Case No. 14-_____
                                                                  :
            Debtors.[1]                                           :    Joint Administration Requested
                                                                  :
-----------------------------------------------------------------x

## DECLARATION OF RANDY LENNAN IN SUPPORT
## OF DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS

Randy Lennan declares as follows:

1.      I am the Chief Executive Officer of Glacial Energy VI, LLC ("**Glacial VI**") and President, Treasurer, and Secretary of each of its title 11 subsidiaries and affiliates (collectively with Glacial VI, the "**Debtors**").  On the date hereof (the "**Commencement Date**"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  I am familiar with the day-to-day operations, business, and financial affairs of the Debtors, having served as Chief Executive Officer of Glacial VI since March 15, 2014 and having served as Senior Executive Officer of Glacial VI and the remaining Debtors since November 21, 2013.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Gridway Energy Holdings, Inc. (5072); Glacial Energy Holdings (3292); Glacial Energy, Inc. (1189); Glacial Energy of New York (0776); Glacial Energy of New England, Inc. (1724); Glacial Energy of Maryland, Inc. (7173); Glacial Energy of California, Inc. (1795); Glacial Energy of Illinois, Inc. (1796); Glacial Energy of New Jersey, Inc. (8671); Glacial Energy of Pennsylvania, Inc. (9762); Glacial Energy of Texas (1517); Glacial Energy of Washington DC, Inc. (5548); Glacial Energy of Ohio, Inc. (0103); Glacial Energy of Michigan, Inc. (7110); Glacial Natural Gas, Inc. (0165); Negawatt Business Solutions (6299); Negawatt Business Solutions, Inc. (f/k/a Gridway Energy Partners, Inc.) (7086); Ziphany, L.L.C. (7934); and Glacial Energy VI, LLC (1142).  The location of the headquarters of Glacial Energy VI, LLC is 5326 Yacht Haven Grande, Box 36, St. Thomas, VI 00802.  The location of the headquarters for the remaining Debtors is 24 Massachusetts 6A, Sandwich, MA 02563.

2.      Prior to serving in this capacity with the Debtors, I served as chief executive officer for Strategic Decisions Inc. ("**SDI**"), which provides energy retail business and financial advisory services.  SDI also co-owns a software-as-service company that provides cloud based business process software for energy retail companies.  I was brought in as an independent restructuring manager for the Debtors by the lender and an equity partner.  I have a long business development and merger and acquisition background in the energy retail area.  I have been involved with and managed start up retail companies in the United States, Australia and New Zealand, with customer counts as high as 500,000 meters.  Companies in the energy retail area that I have worked for include GDF Suez, Utilicorp United (later Aquila), and Unicom (later Exelon), and at various levels up to chief executive officer of subsidiary companies.  I obtained a Bachelors Degree from Iowa State University, and I am a graduate of the Chartered Industrial Gas Consultant program at the Illinois Institute of Technology.  In all, I have well in excess of 20 years of natural gas and electricity retail company experience, both on the demand side and supply side.  I have been at the forefront of natural gas and electricity deregulation in the United States, Australia and New Zealand, having been involved with startup retail entities in all three countries at the onset of deregulation in each.

3.      I submit this declaration (the "**First Day Declaration**") to provide the Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these chapter 11 cases.  I also submit this Declaration in support of the first day motions[2] and applications filed by the Debtors contemporaneously herewith, or as soon as reasonably practicable hereafter, by which the Debtors seek relief enabling the Debtors to continue as going concerns, to operate effectively, to

---

[2] All references to agreements, pleadings, or other documentation or summaries thereof in this First Day Declaration are qualified in their entirety by the terms set forth in the relevant agreements, pleadings, or other documents.

minimize certain of the potential adverse effects of the commencement of their chapter 11 cases, and to preserve and maximize the value of the Debtors' estates.  I submit this Declaration based on my own personal knowledge, except as expressly provided, and as my testimony, if called to testify.

### The Debtors' Business[3]

**B.        The Industry and the Debtors' Position[4]**

4.        The Debtors are a leading provider of electricity and natural gas to commercial, industrial and residential customers in markets that have been restructured to permit retail competition.  As of the Commencement Date, the Debtors provided natural gas service to customers in certain utility markets located in the states of New York, Massachusetts, Maryland, California, Illinois, New Jersey, Pennsylvania, Texas, Ohio, Michigan, the District of Columbia, Florida, Indiana, Virginia, Rhode Island, Maine, and New Hampshire. The Debtors also provided electricity service to customers in certain utility markets located in the states of New York, Massachusetts, Maryland, California, Illinois, New Jersey, Pennsylvania, Texas, Ohio, Michigan, the District of Columbia, Connecticut, Rhode Island, Maine, Delaware, and New Hampshire. The restructuring process that permitted retail competition for electricity or natural gas is briefly described below.

5.        Prior to significant legislative and industry reforms, the generation, transmission, distribution and sales/marketing of electricity and natural gas in the United States was conducted primarily by local publicly-funded monopolies.  Following the development of Federal Energy Regulatory Commission ("**FERC**") and regional reliability authorities, Congress

---

[3]  All references to agreements, pleadings, or other documentation or summaries thereof in this First Day Declaration are qualified in their entirety by the terms set forth in the relevant agreements, pleadings, or other documentation.

[4]  A corporate organizational chart is attached hereto as Exhibit A.

passed the Public Utility Regulatory Policies Act ("**PURPA**") in 1978, which laid the groundwork for deregulation and competition by opening wholesale power markets to non-utility producers of electricity.

6.    Over the course of the 1980s and 1990s state legislatures began passing laws specifically designed to allow competitive retail sale and supply in the natural gas markets. Most significantly, Congress passed the Energy Policy Act of 1992 which specifically promoted greater competition in the bulk power market. This began to de-monopolize the utility industry by allowing independent power producers equal access to the utilities' transmission grid. By 1996, FERC implemented Orders 888 and 889, which were intended to remove impediments to competition in wholesale trade and bring more efficient lower-cost power to the nation's electricity customers. President George W. Bush later signed into law the Energy Policy Act of 2005, which decreased limitations on utility companies' ability to merge or be owned by financial holdings / non-utility companies. This led to a wave of mergers and consolidation within the utility industry.

7.    Today, more than 20 states have at least partially deregulated electricity markets whereby energy customers may choose between their incumbent local utility and an array of independent, competitive suppliers. This is commonly referred to as a "deregulated" or "competitive" power market.

8.    The Debtors were formed with a view of becoming a national provider of power and natural gas in the deregulated energy markets. As a provider of energy commodities to retail customers, the Debtors had relationships with various commodity supply companies, pipelines and local utility companies for the purchase, delivery and distribution of power and natural gas to their customers.

9.     Glacial Energy Holdings ("Glacial") was incorporated in Nevada on May 19, 2005 with its headquarters in Dallas, Texas.  Operating through subsidiaries, including Gridway Energy Holdings, Inc., a Delaware corporation, Glacial was formed as a retail energy supplier selling electricity and natural gas to commercial and industrial customers in deregulated U.S. markets.  Glacial began serving clients in New York, Texas and Maryland, and later expanded rapidly to cover all fully competitive retail power states by 2010.  Glacial surpassed the six million megawatt hours mark in 2011.  Glacial began to offer gas products in 2010 and began servicing residential customers to supplement its business in June 2012.

10.    On November 17, 2008, Glacial VI , incorporated in the United States Virgin Islands ("**USVI**"), was formed to serve as the global headquarters of the collective Glacial group of companies.  Glacial VI effectively took over the management functions carried out by Glacial and centralized functions previously carried out by each operating subsidiary.  Glacial VI carries out strategic planning, the purchase of physical supply, billing operations, marketing, finance, information technology, customer service and telemarketing for all of Glacial's operating subsidiaries.

11.    Glacial employs a variety of marketing channels to penetrate its existing markets and sell its products to a diverse customer base.  Glacial's primary sales channels are:  (i) a 25-person internal sales team, (ii) a network of approximately 5,000 independent contractors (brokers) focused on commercial accounts, (iii) marketing partnerships with unaffiliated companies that market Glacial's energy services through their respective sales forces and distribution networks, and (iv) third-party residential sales forces, telemarketers and door-to-door sales agents that are contracted to market Glacial products on Glacial's behalf.

01:15312354.4

12.    **Internal Sales Team.** Glacial employs a 25-person dedicated sales team based in its various operating regions who service existing customers and work to acquire new commercial customers.

13.    **Broker Network.** Glacial generates the majority of its commercial business through its independent network of brokers, many of whom formerly worked on Glacial's internal sales team. Glacial maintains good relationships with its broker network, which controls a large customer base and typically does not exclusively sell Glacial products. Customers who purchase energy through brokers do not typically have the requisite size or expertise to effectively purchase energy contracts via direct sales. Accordingly, brokers work to educate potential buyers on Glacial's product offering and find tailored solutions that fit individual customer needs. Glacial's internal sales force works to train independent broker sales representatives on how to effectively market its products. Brokers receive compensation based on customer enrollment and monthly energy usage for customers that they enroll directly or indirectly. A typical broker commission structure is paid based on kilowatt hours sold over the life of a customer contract.

14.    **Marketing Partnerships.** Glacial's marketing partners include cable, telecommunications and other companies with well-established marketing capabilities. The customers acquired through such channels have contractual relationships with Glacial. The marketing partner is compensated similarly to a broker with commissions based on customer enrollment and energy usage.

15.     **Residential Sales.**  Residential sales are primarily generated by telemarketing and door-to-door sales.  Glacial uses a contracted sales force from time-to-time to target certain regions and sell certain products both by phone and by door-to-door sales, and will typically compensate these salespeople on a dollar per customer acquired basis.

16.     In addition to residential customers, Glacial services a wide variety of commercial clients.  A typical commercial customer consumes approximately 300,000 kilowatt hours per year.  This is approximately equivalent to the annual energy consumption of a 300 person capacity standalone casual restaurant. Glacial's commercial customers include hospitals, movie theaters, shopping centers, banks, car dealerships, schools, townships, and a variety of other types of non-residential customers.

17.     As of February 28, 2014, Glacial's existing book of customers is comprised of approximately 200,000 electric residential customer equivalents and 55,000 gas residential customer equivalents across the U.S.  A large portion of these customers' energy consumption and revenue is generated in the northeast U.S., Ohio, Illinois, and Texas (which collectively account for 80+% of revenue), with the remaining portion coming from California and other states.  Glacial primarily services commercial and industrial accounts, and sells power on a fixed, fixed with adder, or variable basis.

18.     Depending on the circumstances and needs of its customers, Glacial negotiates contracts of various durations, ranging from month-to-month contracts up to several years' long contracts.  Although the contractual length in the retail competitive electric industry is generally shorter than one year, fewer than 10% of Glacial's existing book of customers have been Glacial customers for shorter than one year (*i.e.*, customers stay even though not contractually bound to do so). In fact, more than half of all customers in Glacial's existing book have been with the

company between 1-3 years, and more than one-third of all customers have been with the company for more than 3 years.

19.      Glacial bills the majority of its customers through a dual billing structure.  Under this structure, the (i) utility sends a bill to the customer for the transmission and transportation of electricity or natural gas as well as distribution charges, and (ii) Glacial sends a separate bill for power generation or commodity charges and is responsible for the collection of its outstanding accounts and has direct credit exposure to the customer.

20.      The majority of Glacial's residential customers fall under Purchase of Receivable Programs ("**POR**") whereby state utilities are responsible for billing the customer, collecting payment from the customer and remitting payment to Glacial.  In states with POR programs, Glacial's credit risk is linked to the applicable utility and not the customer.  Glacial pays a small monthly fee (< 2%) of revenue to the utility for the credit protection offered by the POR program.

21.      A critical element in the process of acquiring natural gas from gas marketing companies is that the gas must flow through long distance natural gas pipelines to the local utility company.  Similarly, a critical element in the process of acquiring electricity from power marketing companies is that the electricity must flow through long distance transmission lines to the local utility.  The Debtors have various agreements with several long-distance gas pipeline and power transmission companies to ensure a steady source of natural gas and power for its customers.

22.      Just as the Debtors require agreements with long-distance natural gas pipeline and power transmission companies, they also need to ensure that once these long-distance gas pipeline and power transmission companies deliver the Debtors' commodities to the local utility

company that the commodities are then delivered to the Debtors' customers. Accordingly, the Debtors—through tariff provisions or under contractual agreements—have arrangements with certain local utility companies to accept the natural gas and power from the long-distance gas pipeline or power transmission companies and to deliver the commodities through their local pipelines or wires to the Debtors' residential and commercial customers in each market. Pursuant to the terms of these agreements, as of the Commencement Date, the Debtors had posted cash, bonds or letters of credit with these utility companies in excess of $20 million as security for the Debtors' performance.

**C.    The Debtors' Prepetition Credit Facilities**

23.    Glacial, EDF Trading North America, LLC, a Texas limited liability company ("**EDFT**") and Vantage Commodities Financial Services I, LLC, a Delaware limited liability company ("**VCFS1**" or the "**Lender**") are parties to that certain Loan and Energy Services Agreement dated as of January 11, 2013 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its provisions, the "**Prepetition LES Agreement**") pursuant to which, among other things, the Lender has extended credit to Glacial from time to time, including pursuant to a revolving credit facility.

24.    Glacial and EDFT are parties to that certain ISDA Master Agreement (1992) dated as of October 11, 2011 and certain schedules and annexes thereto including the Second Amended and Restated Schedule and the Credit Support Annex effective as of January 11, 2013 and certain transactions and confirmations entered into thereunder, as amended or otherwise modified from time to time (the "**ISDA Agreement**"), pursuant to which, among other things, the Debtors purchase whole commodities (*i.e.*, electricity and natural gas) for resale to their customers.

25.    Pursuant to the Prepetition LES Agreement, the Lender has provided certain credit support for the benefit of Glacial in the form of cash, letters of credit, bonds or guarantees in the Lender's capacity as Credit Support Provider under the ISDA Agreement. Specifically, the Lender under the Prepetition LES Agreement makes certain advances to Glacial (on behalf of its operating subsidiaries) to fund the purchase obligations owing to EDFT under the ISDA Agreement, as well as providing additional funding for working capital purposes to Glacial (and the other Debtors). Glacial is required to pay to the Lender, in accordance with the provisions of the Prepetition LES Agreement, any amount that has been drawn by any beneficiary of any cash collateral or letter of credit posted by the Lender or any amount that has been paid by the Lender (or any Affiliate thereof) to any beneficiary of any guaranty provided by the Lender, in each case with interest thereon as provided by the Prepetition LES Agreement.

26.    On or about the Commencement Date, Glacial and EDFT entered into an amendment to the ISDA Agreement (the "**ISDA Amendment**") that, among other things, sets forth additional events of default that are triggered if certain events occur in the Debtors' bankruptcy cases. The ISDA Amendment also expressly provides that as long as an order approving the assumption of the ISDA Agreement (the "**Assumption Order**") is entered within an agreed upon number of days after the Commencement Date, EDFT will:  (a) defer exercising its rights to terminate, liquidate, accelerate, or offset under the ISDA Agreement because of a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code during the period from the Commencement Date through the entry of the Assumption Order, and (b) waive its rights to terminate, liquidate, accelerate, or offset under the ISDA Agreement because of any condition of the kind specified in section 365(e)(1) of the Bankruptcy Code arising prior to the entry of the Assumption Order.  The funds necessary to cure monetary defaults under the ISDA

Agreement will be made available to the Debtors under the proposed debtor-in-possession financing described below. If the proposed debtor-in-possession financing is approved by the Court, the lender will receive liens under Section 364(d) of the Bankruptcy Court to secure the amounts financed post-petition.

27.    Glacial VI and each of Glacial Energy of New York, Glacial Energy of New England, Inc., Glacial Energy of Maryland, Inc., Glacial Energy of California, Inc., Glacial Energy of Illinois, Inc., Glacial Energy of New Jersey, Inc., Glacial Energy of Texas, Glacial Energy of Washington DC, Inc., Glacial Energy of Ohio, Inc., Glacial Natural Gas, Inc., Glacial Energy of Pennsylvania, Inc., Glacial Energy, Inc., Glacial Energy of Michigan, Inc., Negawatt Business Solutions, Negawatt Business Solutions, Inc. (f/k/a Gridway Energy Partners, Inc.), Gridway Energy Holdings, Inc., Ziphany, L.L.C., Energy Applications, Ltd., and Energy Analytics Pty. Ltd. (collectively, the "**Glacial Affiliates**") have guaranteed the obligations of Glacial under the Prepetition LES Agreement and the ISDA Agreement.

28.    As security for the indebtedness and obligations due to Lender under the Prepetition LES Agreement (collectively, the "**Prepetition Indebtedness**"), each of Glacial, Glacial VI and each of the Glacial Affiliates executed and delivered to the Lender a Security Agreement dated as of January 11, 2013 (each a "**Prepetition Collateral Document**" and collectively the "**Prepetition Collateral Documents**"), granting to the Lender a security interest in substantially all of their assets, as more particularly described in the Prepetition Collateral Documents (the "**Collateral**").

29.    The Lender, Glacial and the Glacial Affiliates are also parties to that certain Receivables Purchase Agreement dated as of January 11, 2013 (the "**Receivables Purchase**

**Agreement**") pursuant to which the Lender agreed to purchase, from time to time, certain accounts receivable and related assets (the "**Accounts Receivable**") of the Glacial Affiliates.

## Events Leading To Chapter 11

### A.    Increased Market Competition Leads to Lower Revenue

30.    The competitive retail electric power industry is characterized by high degrees of both fragmentation, competition, and customer attrition because power providers compete primarily on price and have little else available to differentiate their products and services. Particularly in years with high volatility in weather and energy prices, customers paying high electricity and gas bills will tend to seek out other competitive retail electric providers, resulting in higher attrition rates. Also, larger independent retail energy providers have been active in acquiring customer books of their competitors.

31.    Small consumers are also becoming more and more sophisticated in shopping for electric service. In selecting the lowest cost, some residential consumers may choose a pricing plan that changes every month in order to get the lowest near-term price. Others pay an appropriate premium because they prefer to lock in a price for a period of a year or longer. In some instances, there is no premium because the retail energy provider is interested in the long-term customer relationship. "Low cost" is a determination that is made by each consumer, because individuals know how they want to manage their time and resources.

32.    Small consumers are also using energy-efficient appliances and devices, adopting green building technologies, and taking other actions that help protect the environment, but also lower demand for energy products.

33.    All of these factors converged to decrease the Debtors' revenue and cause them to default on certain of their obligations.

01:15312354.4

### B.    The Prepetition Defaults

34.     As of the Commencement Date, Glacial and the Glacial Affiliates are in default under the Prepetition LES Agreement, the ISDA Agreement and the Receivables Purchase Agreement.  As of the Commencement Date, the aggregate amount owed by Glacial and the Glacial Affiliates to the Lender and EDFT under the Prepetition LES Agreement (including any pre-payment for Accounts Receivable under the Receivables Purchase Agreement) and the ISDA Agreement is approximately $60 million.

35.     As of November 21, 2013, Borrower, Guarantors, Lender and EDFT entered into a Forbearance Agreement pursuant to which the Lender and EDFT agreed to forbear from exercising their rights and remedies under the Prepetition LES Agreement, the Prepetition Collateral Documents and the ISDA Agreement for a limited period of time, subject to certain terms and conditions, in order to allow Glacial and the Glacial Affiliates to take certain actions to remedy the existing defaults and to decrease the likelihood of future defaults, including by pursuing a transaction with a third party involving the sale of their assets or the equity interests of the Glacial Affiliates.

36.     The Debtors, working with their advisors, consulted multiple parties concerning the Original Sale Transaction and ultimately began pursuing a stock purchase transaction with an interested buyer (the "**Original Sale Transaction**").  Ultimately, the Original Sale Transaction was terminated in March, 2014.  I was informed that the proposed purchaser withdrew from the Original Sale Transaction because of the large amount of debt that the purchaser would become liable for through such a stock transaction.

37.     On March 6, 2014, Borrower, Guarantors, Lender and EDFT entered into a new Forbearance Agreement pursuant to which the Lender and EDFT agreed to continue to forbear from exercising their rights and remedies under the Prepetition LES Agreement, the Prepetition

Collateral Documents and the ISDA Agreement to allow Glacial and the Glacial Affiliates to pursue these chapter 11 cases.

**C.     Motion for an Order, Pursuant to Bankruptcy Rule 9019, Approving the Settlement Agreement**

38.     On or about the Commencement Date, the Debtors, VCFS1, EDFT, and Gary Mole ("**Mole**") entered into an agreement (the "**Settlement Agreement**") that, subject to this Court's approval[5], settles various issues between the parties arising from their prepetition commercial relationships and, among other things, sets forth an agreement among the parties to conduct a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

39.     In particular, the Settlement Agreement resolves VCFS1's claims against the Debtors under the Prepetition LES Agreement by stipulating that VCFS1 will receive an allowed, secured claim of $27,113,000 in these chapter 11 cases, reflecting amounts due under the Prepetition LES Agreement. The Settlement Agreement further stipulates that VCFS1 will hold a Deficiency Claim (as defined in the Settlement Agreement).

40.     The Settlement Agreement also contains certain "Milestone" provisions that give VCFS1 and EDFT the right to terminate the Settlement Agreement, among other things, (i) if the Court denies the Debtors' motion for approval of the Settlement Agreement or if an order approving the Settlement Agreement is not entered by May 8, 2014; (ii) if the Court denies the ISDA Assumption Motion or if an order granting the ISDA Assumption Motion is not entered by May 8, 2014; (iii) if the Court denies the Debtors' motion seeking approval of the DIP Financing, if an interim order approving the DIP Financing is not entered by April 15, 2014, or if a final order approving the DIP Financing is not entered by May 8, 2014; (iv) if the Court denies

---

[5]     Although a motion seeking approval of the Settlement Agreement is being filed contemporaneously herewith, the Debtors are not seeking approval thereof as a part of their requested first day relief.

the Sale Procedures Motion or if an order approving the Sale Procedures is not entered by May 8, 2014; (v) if the Sale Order is not entered by June 16, 2014; or (vi) if the sale does not close by June 18, 2014.

41.    Under the Settlement Agreement, in exchange for the allowed claims and other consideration provided to VCFS1, VCFS1 agrees to provide the following benefits to the Debtors' estates:

42.    First, VCFS1 agrees to act as DIP Lender, in which capacity VCFS1 will provide essential financing to fund the Debtors' chapter 11 cases. The Debtors will be able to use the proceeds of the DIP Financing to, among other things, (i) fund the ongoing operation of their businesses during these chapter 11 cases; (ii) pay the fees of essential case professionals; (iii) fund the marketing and sale of the Debtors' assets; (iv) pay obligations owed to EDFT under the ISDA Agreement and, if the ISDA Assumption Motion is granted, pay amounts necessary to enable the Debtors to cure defaults under the ISDA Agreement in connection with the assumption of the ISDA Agreement; (v) fund the Receivables Purchase Unwind (as described below); and (vi) fund the Employee Incentive Plan in the event the Court enters an order authorizing the Debtors to assume the Employment Agreements.

43.    Second, VCFS1 agrees to act as the stalking horse bidder in the sale of the Debtors' assets, ensuring that the Debtors will receive a fair price for their assets and encouraging other potential bidders to consider participating in the sale process.

44.    Third, provided that the planned sale of the Debtors' assets closes, VCFS1 agrees to subordinate to the claims of other unsecured creditors (the "Non-Lender Unsecured Claims") a portion of its Deficiency Claim (as defined in the Settlement Agreement) equal to the

lesser of (i) the aggregate amount of the Non-Lender Unsecured Claims or (ii) a subordination cap of $2,000,000.

45.    Fourth, VCFS1 agrees that, upon the closing of the sale, VCFS1 will (i) waive its secured claim as against two of the Debtors, Ziphany, L.L.C. ("Ziphany") and Negawatt Business Solutions, Inc. ("**NBS**"), and (ii) release its liens on any collateral held by Ziphany or NBS. VCFS1 also agrees to waive its rights under the Mole Guarantee.

46.    Fifth, the Settlement Agreement provides for a "Receivables Purchase Unwind," which should materially enhance the marketability of the Debtors' assets. Prepetition, the Debtors sold certain of their accounts receivable and related assets to VCFS1 pursuant to a January 11, 2013 Receivables Purchase Agreement. Pursuant to the Settlement Agreement, the Debtors will use the DIP Financing to repurchase these accounts receivable on the same terms as VCFS1 originally purchased these accounts receivable from the Debtors prepetition. The Debtors' accounts receivable are among the Debtors' most valuable assets and a sale of the Debtors' business will be more attractive to potential bidders if the receivables previously purchased by VCFS1 and all remaining receivables are sold together.

47.    The Settlement Agreement and the transactions contemplated therein were the product of extensive, arm's length negotiations between the parties and their respective representatives, and represents a comprehensive resolution of the parties' disputes.

## Support for Relief Requested in the First Day Pleadings[6]

48.    Concurrently with the filing of their chapter 11 petitions, or as soon as practicable thereafter, the Debtors have filed (or will file) several motions and applications (the "**First Day Motions**") and a number of accompanying proposed orders (the "**First Day**

---

[6]    Capitalized terms not defined hereafter shall have the same meanings ascribed to such terms in the respective First Day Motions.

**Orders**"), pursuant to which the Debtors request relief they believe is critical to enable them to preserve their going concern value for creditors.

49.     I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct.  A brief description of the relief requested and the facts supporting each of the First Day Motions and First Day Orders is set forth below.  As set forth more fully below, I believe that the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and facilitate their reorganization efforts.

**(i)     Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1, Directing Joint Administration of Chapter 11 Cases**

50.     As an initial matter, the Debtors are requesting joint administration of their cases for procedural purposes only.  Joint administration avoids the preparation, service, and filing of duplicative notices, pleadings, and orders in each Debtor's case.  This will save considerable expense, time and resources, and facilitate the ability of parties in interest to monitor these chapter 11 cases.

01:15312354.4

51.    I believe joint administration of the Debtors' chapter 11 cases is in the best

interests of the Court and its clerk's office, the Debtors, their estates, and all parties in interest.

**(ii)    Motion For Interim And Final Orders: (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, And 364, (II) Authorizing Debtors To Use Cash Collateral, (III) Granting Liens And Superpriority Claims To Postpetition Lenders Pursuant To 11 U.S.C. §§ 364 And 507, (IV) Granting Adequate Protection To Prepetition Les Lenders Pursuant To 11 U.S.C. §§ 361, 362, 363, 364, And 507, (V) Scheduling Final Hearing Pursuant To Bankruptcy Rule 4001(C) And Local Bankruptcy Rule 4001-2, And (VI) Granting Related Relief**

52.    The Debtors intend to finance their post-petition operations through the

"**DIP Credit Facility**", which consists of term and revolving loans in an aggregate amount of up

to $122 million[7] to be provided by VCFS1 as agent (solely in such capacity, the "**DIP Agent**")

and lender and any additional lenders that become party to the DIP Credit Facility (together with

VCFS1, in its capacity as a lender under the DIP Credit Facility, the "**DIP Lenders**").  The

Debtors request authority to, among other things, (a) obtain post-petition financing pursuant to

the DIP Credit Facility, the salient terms of which are detailed in the referenced motion, (b) grant

adequate protection to the Prepetition LES Lenders for the priming of their liens in the

Prepetition Collateral and the Debtors' use of Cash Collateral, and (c) use the Cash Collateral of

the Prepetition LES Lenders (the "**Financing Motion**").[8]

53.    The Debtors have an immediate need to use Cash Collateral and for

postpetition financing under the DIP Credit Facility to continue to finance their postpetition

operations and pay administrative expenses.  Such financing is critical to preserve the going-

---

[7]        The final aggregate amount is subject to change among agreement of the parties to the DIP Credit Agreement.

[8]        Capitalized terms not otherwise defined in this section shall have the meanings ascribed to them in the Financing Motion.

concern value of the Debtors' estates, and to provide the Debtors with an opportunity to effectuate the sale of their assets.

54.     Because virtually all of the Debtors' assets are encumbered by the liens of the Prepetition LES Lenders, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and other operating expenses, including, but not limited to, utility obligations.  Due to the nature and magnitude of the Debtors' operations, which are dependent upon uninterrupted access to necessary working capital, immediate access to Cash Collateral and the DIP Credit Facility is essential to prevent irreparable harm to the Debtors' estates.  The use of Cash Collateral and access to the DIP Credit Facility is also necessary to provide assurance to employees, suppliers and other parties that they will be paid on a timely basis for post-petition services, and to assure customers that they will have uninterrupted access to the Debtors' products and related services.  Without immediate usage of Cash Collateral and access to the DIP Credit Facility, the Debtors' day-to-day operations would come to a halt, jeopardizing the Debtors' chapter 11 cases from the outset.

55.     Based on consultation with the Debtors' professional advisors, I believe that the terms for the use of the Cash Collateral and the terms of the related adequate protection (discussed below) are (i) reasonable and sufficient to protect the interests of the Prepetition LES Lenders, (ii) consistent with and authorized by the Bankruptcy Code, and (iii) necessary to obtain the consent of the Prepetition LES Lenders to the Debtors' use of the Cash Collateral.  The Cash Collateral Documents have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors and the Prepetition LES Lenders.  The terms of the Cash Collateral Documents, including, without limitation, the Adequate Protection, are fair and

01:15312354.4

19

reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

56.     However, the use of Cash Collateral alone would be insufficient to meet the Borrower's immediate postpetition liquidity needs.  Accordingly, an immediate and critical need exists for the Borrower to obtain postpetition financing.

57.     The Debtors submit that, other than the DIP Credit Facility, there are no viable financing alternatives available to them under the circumstances.  In that regard, prior to the Commencement Date, the Debtors' proposed investment banker, Houlihan Lokey Capital, Inc. ("**Houlihan**"), explored available DIP financing options.  Such efforts were complicated by several factors, including, among others, the Debtors' debt structure (which includes several tranches of secured debt), the value of the Debtors' businesses and assets, the unavailability of unencumbered assets, the Debtors' immediate need for liquidity under a DIP Credit Facility, and the devastating adverse impact any delay in obtaining DIP financing would have on the going-concern value of the Debtors' estates.

58.     Houlihan contacted three sophisticated lending sources that are well-known in the DIP loan arena to gauge market interest in providing DIP financing to the Debtors on an unsecured basis and/or secured by junior liens on the Debtors' fully encumbered assets. After discussing with Houlihan the size and scope of the required financing, the amount of prepetition secured debt that would be senior to such a junior DIP loan, the Debtors' financial status and the nature and extent of the Debtors' business operations, none of the lenders contacted were willing to make a DIP financing proposal, and further efforts on that front would not have yielded different results.

59.     As a result, the Debtors focused their efforts on negotiating the DIP Credit Facility proposed by the DIP Lenders. In the weeks prior to the Commencement Date, the Debtors and the DIP Lenders exchanged several iterations of term sheets for the DIP Credit Facility and multiple drafts of the DIP Financing Documents. Initial drafts of the DIP Credit Agreement were developed in the days leading up to the Commencement Date, and the Debtors and the DIP Lenders continued to negotiate and finalize such documents up until the Commencement Date. Thus, the terms and conditions of the DIP Credit Facility were the product of extensive good faith, arm's length negotiations among the Debtors, the DIP Agent, the DIP Lenders, and their respective professional advisors. Indeed, certain terms that were initially proposed by the DIP Lenders were negotiated by the Debtors' professional advisors and ultimately modified for the benefit of the Debtors.

60.     Moreover, based on consultation with the Debtors' professional advisors, I believe that the terms and conditions of the DIP Credit Facility are fair, reasonable and appropriate, and reflect extensive compromise on both sides. I believe that, through the DIP Credit Facility, the Debtors achieved the best possible outcome for their financing needs under the circumstances. Accordingly, and based on my discussions with the Debtors' professional advisors, I believe that the DIP Credit Facility is the best and only viable financing option available to Debtors under the circumstances. I further believe that the DIP Credit Facility provides the Debtors with access to additional liquidity that is critical to maintaining the going concern value of these estates while the Debtors pursue an expeditious sale of their assets.

61.     In connection with the DIP Credit Facility, the Debtors propose to provide adequate protection to the Prepetition LES Lenders in the manner specified in the Financing Motion and the Interim Order. As more fully described in the Financing Motion and the Interim

01:15312354.4

Order, such adequate protection measures include the following: (i) replacement liens on the Collateral subject and subordinate only to the DIP Liens, the Swap Liens and the Carve-Out, (ii) superpriority administrative expense claims subject and subordinate only to the DIP Superpriority Claims and the Swap Superpriority Claims, (iii) the right to request periodic cash payments equal to the amount of interest otherwise due and owing under the Prepetition Loan Documents, (iv) the requirement that any chapter 11 plan proposed by the Debtors, if such plan does not provide for the payment of the Prepetition Indebtedness in full, be in form and substance acceptable to the Prepetition LES Lenders, (v) receipt of certain financial and organizational information, (vi) imposition of certain milestones on the Debtors, (vii) deadlines to file schedules and statements and bar date motions, (viii) limited variances of amounts in the Approved Budget, and (ix) certain financial reporting and collateral monitoring rights. Such measures were negotiated in good faith and at arm's length among the Debtors, the DIP Lenders, and the requisite Prepetition LES Lenders. I am advised that the Prepetition LES Lenders support and consent to the Debtors' use of Cash Collateral as contemplated by the DIP Credit Facility, subject to the provisions and protections outlined above and contained in the Interim Order.

62.    Because virtually all of the Debtors' assets are encumbered by the liens of the Prepetition LES Lenders, access to the DIP Credit Facility under the terms set forth in the DIP Financing Documents, including, but not limited to the consensual priming of the Prepetition Liens on the Collateral, will benefit all stakeholders, including unsecured creditors, because the DIP Credit Facility will fund a long sale process that will ultimately maximize value for the Debtors' estates.

63.    Overall, I believe that entering into the DIP Credit Facility is a sound exercise of the Debtors' business judgment, and that authorization to use Cash Collateral and approval of the DIP Credit Facility and the other relief requested in the Financing Motion is in

01:15312354.4

the best interests of the Debtors' estates and a necessary component for the Debtors to run a

competitive sale process designed to maximize value for their creditors.

   (iii)    **Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 345, 363,
            364, and 503(b) and Bankruptcy Rules 6003 and 6004, for Order
            (I) Authorizing Debtors to Continue Using their Cash Management System
            and Maintain Existing Bank Accounts and Business Forms, (II) Waiving
            Compliance with the Deposit and Investment Requirements of Bankruptcy
            Code section 345(b), and (III) Prohibiting Banks from Offsetting any Funds
            of Debtors**

            64.    To manage their businesses and operations efficiently, the Debtors utilize

a cash management system (the "**Cash Management System**") to collect and transfer funds

from numerous sources and accounts, and disburse funds to satisfy obligations arising from the

daily operation of their businesses.  To facilitate the Debtors' transition into chapter 11 and the

uninterrupted operation of their Cash Management System, the Debtors request authority to

(i) continue using their Cash Management System and maintain the existing bank accounts and

business forms currently in use, (ii) forgo compliance with the restrictive deposit and investment

requirements outlined in the Office of the United States Trustee (the "**U.S. Trustee**") guidelines,

and (iii) prohibit Banks from offsetting, freezing, affecting, or otherwise impeding the use of,

transfer of, or access to, any funds of the Debtors.

            65.    In the ordinary course of business, the Debtors use the Cash Management

System, which is similar to those utilized by other large companies, to streamline collection,

transfer, and disbursement of funds generated by the Debtors' business operations.  All funds

received by the Debtors electronically are initially deposited into deposit accounts (the "**Deposit

Accounts**") maintained by certain of the Debtors at First National Bank of Central Texas

("**FNBCT**").  All checks received by the Debtors are deposited into a lockbox account (the

"**Lockbox Account**") maintained by Glacial Energy Holdings at FNBCT.

66.     The funds in the Deposit Accounts and in the Lockbox Account are swept daily and placed into an aggregation account (the "**Glacial Aggregation Account**").  Since 2013, the funds held in the Glacial Aggregation Account are assigned to the Lender through a collection account maintained at Wells Fargo (the "**Receivables Collection Account**"), and the Lender in turn finances the Debtors' operations by releasing necessary funds and depositing the funds in an operating account (the "**VCFS I Operating Account**") maintained at Wells Fargo. Some of the funds released by the Lender are held in a collateral account maintained by the Debtors at FNBCT (the "**Glacial Collateral Account**") where they are used to fund letters of credit and for other forms of collateral (cash or bonds supported by cash) (collectively, the "**FNBCT Collateral**") which the Debtors are required to post in the ordinary course of their business operations.  Other funds are held in a reserve account (the "**Glacial Revenue Account**") and an operating account (the "**Glacial Operating Account**"), both of which are maintained at FNBCT.  The funds held in the Glacial Revenue Account are used to pay charges owed by the Debtors to independent service operators, utilities, pipelines and other supplier-related charges, while the funds held in the Glacial Operating Account are used by the Debtors to make payroll and other selling, general and administrative expense payments.

67.     As part of their ordinary course of business, funds are transferred by and among certain of the Debtors.  The Debtors maintain journal entries evidencing these transfers, and these balances represent extensions of intercompany credit made in the ordinary course of business.  To ensure that each individual Debtor will not, at the expense of their creditors, fund the operations of an affiliated entity, the Debtors respectfully request that the Court, pursuant to Bankruptcy Code sections 503(b)(1) and 364(b), authorize the Debtors to treat all such obligations (the "**Intercompany Claims**") arising after the Commencement Date in the ordinary

course of business as administrative expenses. If the Court authorizes the Debtors to treat the Intercompany Claims as administrative expenses, then each entity utilizing funds flowing through the Cash Management System and receiving services through the intercompany arrangements should continue to bear ultimate repayment responsibility for such ordinary course transactions and their related share of the cost of services provided.

68.    The Debtors maintain the Bank Accounts as part of their Cash Management System. Rigid adherence to the "Operating Guidelines for Chapter 11 Cases" (the "**Guidelines**") of the U.S. Trustee for Region Three (the "**U.S. Trustee**") would require, as of the Commencement Date, closing the Bank Accounts and opening new accounts. The Debtors believe that this would be unduly burdensome and disruptive, and the transition to chapter 11 will be more efficient and orderly if the Debtors have the discretion to continue use of the Bank Accounts following the Commencement Date with the same account numbers. The Debtors submit no negative impact will result to any party in interest by maintaining the Bank Accounts.

69.    Accordingly, the Debtors request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts or any other new account that may be opened in the ordinary course of the Debtors' businesses. The Debtors also request that the Court authorize the Banks to receive, process, honor, and pay all prepetition (only if such prepetition amount is authorized to be paid by this Court) and postpetition checks issued or to be issued, and electronic fund transfers requested or to be requested.

70.    Furthermore, to minimize administrative expense and delay, the Debtors request authority to continue to use their existing business correspondence and forms, including

letterheads, wire transfer instructions, and other business forms (collectively, the "Business Forms") substantially in the form existing before the Commencement Date, without reference to the Debtors' status as debtors in possession.  In the event the Debtors need to purchase new stock or additional other Business Forms during the pendency of these chapter 11 cases, such stock and/or other Business Forms will include a legend referring to the Debtors as "Debtors in Possession" or "DIP."  The Debtors shall not be required to place such a legend on pre-printed stock until they exhaust their current stock in accordance with Local Rule 2015-2(a).  Any business parties doing business with the Debtors undoubtedly will be aware, as a result of the size of these cases and the nature of the industry, of the Debtors' status as debtors in possession. To the extent the Debtors have the ability to electronically alter legends on their check stock or other Business Forms, however, the Debtors will alter such legends so as to refer to the Debtors as "Debtors in Possession" or "DIP" as soon as reasonably practicable after the Commencement Date.

71.    If the Debtors are not permitted to maintain and utilize their existing Bank Accounts and existing Business Forms, significant disruption to the Debtors' financial affairs and daily business operations is likely to occur through delay in the administration of the Debtors' estates and attendant costs relating to establishing new systems, opening new accounts, and ordering new Business Forms.

72.    Further, FNBCT provides the Debtors with the FNBCT Collateral which the Debtors post in the ordinary course of their business operations.  Because the Debtors secure the FNBCT Collateral largely on a dollar for dollar basis through deposits maintained in the Glacial Collateral Account, the Debtors do not believe that the FNBCT Collateral issued by FNBCT constitutes an extension of credit requiring approval under section 364(b) or (c) of the

Bankruptcy Code.  Nevertheless, to the extent that the Court construes the FNBCT Collateral

issued by FNBCT as extensions of credit, the Debtors seek approval of such extensions of credit

and authority to continue utilizing the FNBCT Collateral program with FNBCT.

73.     The Debtors request, for cause, an order waiving for 45 days, on an

interim basis, the Debtors' compliance with the deposit and investment guidelines of Bankruptcy

Code section 345(b) with respect to any accounts that do not currently meet the guidelines,

without prejudice to the Debtors' ability to seek a further interim waiver or a final waiver (either

by the passage of the 45-day period without an objection having been filed or upon a final

hearing).

74.     I submit that the Cash Management System is an ordinary course, essential

business practice that provides significant benefits to the Debtors' corporate group.  In my

opinion, any disruption of the Cash Management System at this critical juncture would

irreversibly and irreparably harm the Debtors' business operations, and the value thereof.

Therefore, I believe the maintenance of the existing Cash Management System, as well as the

various related relief requested in the Cash Management Motion, is in the best interests of the

Debtors' estates and all parties in interest.

**(iv)     Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), 363(c), 507(a)(4), and 507(a)(5) and Bankruptcy Rules 6003 and 6004 for Order (I) Authorizing Payment of Prepetition Employee Obligations and Continuation of Prepetition Employee Benefits, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief**

75.     The Debtors are requesting authority to pay, in their discretion, any and all

obligations and costs incurred in respect of or related to employee obligations, including

prepetition Basic Pay Obligations, Bonus and Commission Obligations, Payroll Taxes, Payroll

Service Fees, Expense Reimbursements, and other Employee Benefit Obligations (each as

defined in the motion and collectively, the "**Employee Obligations**"), and to maintain and continue their prepetition employee-related practices, programs, and policies comprising such Employee Obligations, as may be modified, amended, or supplemented from time to time in the ordinary course. Additionally, to facilitate the required payments and maintenance of these programs, the Debtors are requesting the Court to authorize applicable banks and other financial institutions to receive, honor, process, and pay any and all checks and electronic transfers drawn on the Debtors' accounts, to the extent that such checks or transfers relate to any Employee Obligation (except for any payments to insiders).

76.    In the ordinary course of their businesses, the Debtors incur payroll and various other obligations, such as expense reimbursements, and provide healthcare coverage, incentive programs, and other benefit plans to approximately 99 employees in exchange for the performance of services. The Debtors estimate that the aggregate amount of the prepetition Employee Obligations accrued and unpaid as of the Commencement Date, including all costs incident to such obligations, does not exceed approximately $2,500,000.

77.    To the extent there are prepetition amounts outstanding as of the Commencement Date for Basic Pay Obligations, the Debtors believe these are priority claims that must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Further, for amounts exceeding the priority claim limit of $12,475, and for Employee Obligations not otherwise entitled to priority, the Debtors request authority to pay such prepetition amounts due to the employees, because such payments are essential to the Debtors' operations and the benefits achieved by such payments far exceed the negative effects resulting from failure to make such payments. The Debtors do not believe that any wage or benefit

payments subject to the statutory priority cap of Bankruptcy Code sections 507(a)(4) and 507(a)(5) will be made in excess of $12,475 per employee.

78.    In this case, the Debtors believe any delay in payment or failure to continue to honor the programs and policies comprising the Employee Obligations would cost the Debtors' estates more than the requested payments due to factors such as the cost of losing an employee's knowhow and the cost of replacement of some employees who would be inclined to accept other jobs. Failure to make these payments is likely to impair irreparably the employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with its employees at a time when the employees' support is critical to the Debtors' chapter 11 cases and ongoing business operations. Further, absent the relief requested, the employees may suffer undue hardship and, in many instances, serious financial difficulties, as many employees rely on their wages and benefits to meet their personal financial obligations.

79.    In addition, it would be inequitable to require the Debtors' employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors. I submit that payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates and their creditors and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption.

**(v)    Debtors' Motion, Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 507(a)(8), for Order Authorizing (I) Payment of Certain Prepetition Taxes and Related Amounts to Governmental Entities, and (II) Financial Institutions to Honor and Process Related Checks and Transfers**

80.    The Debtors request an order (i) authorizing, but not directing, the Debtors to pay, subject to the Debtor-In-Possession (the "**DIP**") budget (and the budget variances as permitted under the DIP Credit Agreement), to the Taxing Authorities certain prepetition taxes

attributable to amounts that have been invoiced or actually collected and are held "in trust" by the Debtors for payment to one or more Taxing Authorities (all such prepetition taxes, (the **"Trust Fund Taxes"**) as they become due and payable because the taxes are collected from Debtors' customer(s) or deducted from a payment requiring withholding, which taxes may, but do not necessarily, include Sales Taxes (defined below); (ii) authorizing, but not directing, the Debtors to pay, subject to the DIP budget (and the budget variances as permitted under the DIP Credit Agreement), to the Taxing Authorities certain related amounts assessed as penalties or otherwise by Taxing Authorities concerning such Trust Fund Taxes (**"Related Amounts"**) as they become due and payable; and (iii) authorizing banks and other financial institutions (collectively, the **"Banks"**) to honor and process related checks and transfers.

81.    A "sales tax" is a consumption tax calculated as a percentage of the sale price that is charged at the point of purchase for certain goods and services (the **"Sales Taxes"**). The Debtors remit Sales Taxes monthly, quarterly, semi-annually, or annually in arrears depending on the Debtor and the Taxing Authority for each taxing state or locality to which the Debtors have a sufficient nexus. The Debtors pay approximately $1.8 million (one-million eight-hundred-thousand dollars) in Sales Taxes each month. As a result of the commencement of these cases, the Debtors believe a portion of the accrued Trust Fund Taxes and Related Amounts, including these Sales Taxes, may remain due for the applicable periods immediately preceding the Commencement Date (the **"Current Periods"**). As of the week before the Commencement Date, the Debtors owe approximately $2 million on account of Sales Taxes that constitute Trust Fund Taxes and Related Amounts due for the Current Periods. In addition, Rhode Island has assessed Sales Taxes that constitute Trust Fund Taxes and Related Amounts due for earlier tax periods in an aggregate amount of $200,000. Accordingly, the Debtors

request authority to make payments for these Trust Fund Taxes and Related Amounts for the Current Periods in the same manner as they would have been made before the Commencement Date and for earlier tax periods with respect to the assessment by Rhode Island without further approval from this Court, in an aggregate amount not to exceed $2.5 million.

82.    Payment of the prepetition Trust Fund Taxes and Related Amounts is critical to the Debtors' uninterrupted business operations.  I understand that even if some of the Trust Fund Taxes and Related Amounts are not "trust fund" taxes in a particular jurisdiction, payment of Trust Fund Taxes and Related Amounts should nevertheless be authorized because they may be priority claims and some Taxing Authorities may audit the Debtors if such Trust Fund Taxes and Related Amounts are not paid timely.  Such audits would needlessly divert the Debtors' attention from their sale and reorganization efforts.  In addition, some Taxing Authorities may also seek to impose liens on the Debtors' assets on account of unpaid Trust Fund Taxes and Related Amounts, which liens would require time, effort, and expense for the Debtors to challenge and remove.  An improper lien or the failure to pay certain Trust Fund Taxes and Related Amounts might also affect the Debtors' good standing in a particular state, potentially affecting the Debtors' ability to continue operating in the ordinary course.  Timely payment of the Trust Fund Taxes and Related Amounts is necessary to avoid such distractions, and is thus in the best interest of the Debtors and their estates.

83.    Also, I understand that nonpayment of some of these obligations will likely result in unwarranted penalties, audits, and the imposition of personal liability on the officers and directors of the Debtors for Trust Fund Taxes collected but not paid to the applicable Taxing Authorities.  Thus, to the extent any Trust Fund Taxes remain unpaid, the Debtors' officers and directors may be subject to audits, lawsuits, or even criminal prosecution on account

01:15312354.4

of such nonpayment during the pendency of these chapter 11 cases. Such proceedings would constitute a significant distraction for such officers and directors at a time when they should be focused on stabilizing postpetition business operations and developing and implementing a successful sale and reorganization strategy. I am also advised that the Trust Fund Taxes are afforded priority payment status in a chapter 11 case. Therefore, the relief requested will only affect the timing of the payment of Trust Fund Taxes and will not prejudice the rights of general unsecured creditors or other parities in interest. Finally, "trust-fund" taxes may not constitute property of the estate.

84.     Based on the foregoing, I submit that paying the Trust Fund Taxes and Related Amounts is well within the Debtors' sound business judgment and is in the best interest of the Debtors' estates.

> **(vi)    Debtors' Motion for Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto**

85.     The Debtors are requesting relief to prohibit their utility providers (the "**Utility Providers**"), identified on Exhibit A to the Utilities Motion, from altering, refusing, or discontinuing utility services to the Debtors as a result of the commencement of these chapter 11 cases, or the existence of any unpaid prepetition invoices, including the making of demands for security deposits or accelerated payment terms. The Debtors have proposed adequate assurance for the Utility Providers, and proposed procedures for resolving Utility Providers' objections to such procedures and the proposed adequate assurance.

86.     In connection with their ongoing business operations, the Debtors incur utility expenses in the ordinary course for, among other things, the use of natural gas, electricity,

water, sewer service, local and long-distance telephone service, waste disposal, and other similar services (collectively, the "**Utility Services**").  Uninterrupted Utility Services are essential to the Debtors' ongoing operations.  Moreover, replacement Utility Providers would be difficult to identify and, in some locations, impossible to find, given that many utilities enjoy a virtual monopoly in certain regions, leaving consumers with no alternatives.  The business disruption that would likely result from interruption of the Utility Services would negatively impact the Debtors' operations, and would adversely affect the Debtors' patients, estates, creditors, and employees.  Accordingly, to continue as a going concern, the Debtors must continue to receive uninterrupted Utility Services.

87.    The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses. To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit $10,000, which is approximately equal to 50% of the Debtors' average aggregate monthly cost for utility service, into an interest-bearing, newly created segregated account within twenty (20) days of the Commencement Date (the "**Utility Deposit**"), subject to providing additional adequate assurance upon request of a particular Utility Company.

88.    The Debtors further propose to maintain this Utility Deposit until there is a further hearing on this matter.  Thereafter, the Debtors propose to adjust the amount of the Utility Deposit to maintain an Utility Deposit that consistently provides the Utility Providers with coverage for half of an average month's usage of the applicable Utility Services, and any additional amounts deemed necessary to maintain the Utility Services.

89.    I believe that the Utility Deposit, taken together with the facts and circumstances of the Debtors' chapter 11 cases (together, the "**Proposed Adequate**

**Assurance**"), constitute sufficient adequate assurance to the Utility Providers.  If any Utility

Provider believes adequate assurance is required beyond the Proposed Adequate Assurance,

however, it must request such additional assurance pursuant to the procedures described below

(the "**Adequate Assurance Procedures**").

90.     The relief requested ensures the Debtors' business operations will not be

disrupted by the lack of critical Utility Services.  Absent approval of the proposed Adequate

Assurance Procedures, the Debtors could be forced to negotiate with each Utility Provider

individually with the risk that a Utility Provider will delay until they have the ability to terminate

service.  During this critical postpetition period, the Debtors' efforts and resources would

unquestionably be more productive if focused on their restructuring.

91.     The Debtors request a further hearing on the Utilities Motion to be held

within 25 days of the Commencement Date to ensure that, if a Utility Provider argues it can

unilaterally refuse service to any of the Debtors on the 31st day after the Commencement Date,

the Debtors will have had the opportunity to request modifications to the proposed Adequate

Assurance Procedures to avoid any potential termination of Utility Services.

(vii)    **Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 363(b) and 105(a) Authorizing (i) the Debtors to Pay the Prepetition Claims of Certain Critical Vendors, and (ii) Financial Institutions to Honor and Process Prepetition Checks and Transfers to Certain Critical Vendor**

92.     The Debtors have closely examined the extent to which Critical Vendor

Payments are necessary to avoid irreparable harm.  After a review of their accounts payable and

other books and records, the Debtors have narrowed the Critical Vendors to the Distribution

Providers and ISOs (each as defined below) who provide the Debtors with critical services

described below which are the life-blood of the Debtors' business operations; namely, the

delivery of electricity and natural gas to their customers.

93.     As set forth in greater detail above, the Debtors operate nationwide to supply electricity and natural gas to customers in deregulated markets.  The Debtors purchase all of their natural gas needs from EDFT (as defined in the First Day Declaration) and all of their electricity needs from the ISOs (as defined below) and transport the natural gas and electricity to their customers using the wires, poles, power lines and pipelines that are owned and operated by local transmission and distribution service providers and utilities (the "**Distribution Providers**").  These Distribution Providers are the sole source provider of energy transportation services in the local areas for energy providers.  The Debtors utilize the services of approximately one hundred fifty (150) Distribution Providers to deliver their natural gas and electricity to their customers throughout the country.  Generally, the Debtors pay these Distribution Providers for distribution services and related charges on a monthly basis for costs incurred for the previous month.  Therefore, although the Debtors are current in all of the payments to the various Distribution Providers, the Debtors anticipate that there will still be amounts due on the Commencement Date for prepetition transportation services provided by the Distribution Providers prior to the Commencement Date.  Based on historical data, the Debtors estimate that the aggregate amount due to the Distribution Providers as of the Commencement Date will be approximately $1.7 million.

94.     As stated above, the Distribution Providers are the sole means for transporting natural gas and electricity to the customers in their particular area, and therefore, the Debtors' only means of transporting its natural gas and electricity to their customers.  If the Distribution Providers are not paid prepetition amounts that they are owed, they may terminate the Debtors ability to continue to provide energy services to their customers and the customers will revert to their default energy provider.  Simply put, the Debtors will lose all of their

01:15312354.4

customers in that Distribution Provider's area to the default energy provider for that area which would have a severely detrimental impact on the Debtors business operations.

95.    To oversee the flow of the electricity through the energy power system in the deregulated markets, the Federal Energy Regulatory Commission established organizations known as Independent System Operators ("**ISOs**"). These ISOs are independent, federally regulated entities who, acting essentially as a clearing house, are paid by energy providers to coordinate, control and monitor the operations of a power distribution system in a given state or region of which they are the sole electricity provider. The Debtors purchase all of their electricity needs from the six (6) different ISOs who manage the flow of electricity for the states and regions in which the Debtors operate. As part of the Debtors' business operations, the Debtors purchase electricity from the ISO and use the local Distribution Providers to transport same to the customer.

96.    The Debtors get their electricity from the ISOs through EDFT and the ISDA Agreement and pay EDFT for same in accordance with the ISDA Agreement. The Debtors pay EDFT based on projected amounts needed for a given period. However, the ISOs subsequently perform a weekly reconciliation and bill the Debtors directly for the difference between what was projected and what was actually used by the customers if the amount used was more than what was projected. Although, the Debtors are current with all of their obligations to the ISOs, as the result of the lag time between the purchase of the electricity and the true-up process, there likely will be unpaid amounts due directly to the ISOs for electricity purchased prior to the Commencement Date. Based on historical data, the Debtors estimate that the aggregate amount that they owe directly to the ISOs as of the Commencement Date will be approximately $1.9 million.

97.    The ISOs are the sole electricity provider for their particular state or region, and therefore, the Debtors' only source of electricity for their customers.  If the ISOs are not paid prepetition amounts that they are owed, they may terminate the Debtors ability to continue to purchase electricity in that state or region.  If the Debtors are unable to procure electricity, then they will be unable to provide the customers with their electricity needs.  In that circumstance, the customers will revert to their default energy provider, and the Debtors will lose all of their customers in that area to the default energy provider for that area

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 10, 2014.

_____
Randy Lennan

## Exhibit A

Ownership Structure

